**KING ENTERPRISES, INC.**
v.
**The UNITED STATES.**
No. 114–66.

United States Court of Claims.
Nov. 14, 1969.

---

512

Thomas A. Caldwell, Jr., Chatta-
nooga, Tenn., attorney of record for

plaintiff. Stophel, Caldwell & Heggie, Chattanooga, Tenn., of counsel.

Norman J. Hoffman, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R. Miller, Washington, D. C., and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969 Rule 134(h)]. The commissioner has done so in an opinion and report filed on May 27, 1969. On June 25, 1969 defendant filed its notice of intention to except which defendant has subsequently withdrawn. On October 1, 1969 plaintiff filed a motion that the court adopt the commissioner's findings of fact, opinion and recommendation for conclusion of law as the basis for its judgment in this case. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff's motion of October 1, 1969 is granted and it is concluded that plaintiff is entitled to recover. Judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c) [prior to September 1, 1969 Rule 47(c)].

## OPINION OF COMMISSIONER

BERNHARDT, Commissioner:

This is an action to recover Federal income taxes paid by petitioner for the fiscal year ended June 30, 1960. The issues involve the proper characterization for tax purposes of the transaction in question, and the tax treatment of the resulting gain. The facts detailed in the accompanying report, condensed here, sustain the conclusion that the petitioner is entitled to recover.

Petitioner, King Enterprises, Inc., is a Tennessee corporation presently engaged in the business, *inter alia,* of holding and managing various investments. Prior to October 30, 1961, petitioner's business, then styled Fleetwood Coffee Company, was the sale of roasted coffee. It was one of 11 shareholders in Tenco, Inc., a corporation organized in 1951 to supply its shareholders with a reliable source of instant coffee for them to market under their own brand names. Tenco was financially successful over the years, and by 1959 had become the second largest producer of soluble coffee in the United States. Despite its financial success there was stockholder discontent.

Minute Maid Corporation had become by 1958 one of the nation's principal producers of frozen concentrated citrus juices. Because of financial reverses in 1957 Minute Maid decided to acquire other businesses in order to stabilize its income. Between January and July 29, 1959, Minute Maid submitted and the Tenco directors rejected three separate proposals for acquisition of Tenco stock. A fourth proposal was approved by the respective boards on August 25, 1959, and on September 3, 1959, petitioner and other Tenco shareholders signed an agreement with Minute Maid entitled "Purchase and Sale Agreement".

Pursuant to the Agreement providing for the sale of their Tenco stock to Minute Maid, the Tenco shareholders received a total consideration consisting of $3,000,000 in cash, $2,550,000 in promissory notes,[1] and 311,996 shares of Minute Maid stock valued at $5,771,926. Petitioner's share of the total consideration consisted of $281,564.25 in cash,

1. The promissory notes of Minute Maid were payable on November 1, 1960, and November 1, 1961, in the amount of $1,275,000 on each date.

$239,329.40 in promissory notes, and 29,282 shares of Minute Maid stock valued at $541,717. The Minute Maid stock received by Tenco stockholders represented 15.62 percent of the total outstanding Minute Maid shares, and constituted in excess of 50 percent of the total consideration received.

On December 10, 1959, the Minute Maid directors approved the November 24th recommendation of its general counsel to merge the company's four subsidiaries, including Tenco, into the parent company, and authorized that the merger be submitted to its stockholders for approval at a meeting scheduled for February 1960. Minute Maid's annual report to stockholders announced the merger plan about December 3, 1959. On January 5, 1960, Minute Maid requested a ruling from the Commissioner of Internal Revenue whether in the event of the proposed Tenco merger the basis of Tenco assets in Minute Maid's hands would be determined under section 334 (b) (2) of the Internal Revenue Code of 1954. This was approved by the Commissioner by ruling of February 25, 1960 that "Under the provisions of section 334(b) (2) that basis of the property received by Minute Maid upon the complete liquidation of Tenco will be determined by reference to the adjusted basis of the Tenco stock in the hands of Minute Maid." On April 30 and May 2, 1960, in accordance with the applicable state laws, Tenco and certain other subsidiaries were merged into Minute Maid.

On its income tax return for the fiscal year ended June 30, 1960, petitioner reported the cash and notes received as dividend income, subject to the 85 percent intercorporate dividends received deduction. The value of the Minute Maid stock received by petitioner was not reported, it being petitioner's position that such stock was received in connection with a nontaxable corporate reorganization. The District Director of

Internal Revenue assessed a deficiency on the ground that the gain portion of the total consideration received (cash, notes, and Minute Maid stock) constituted taxable capital gain from the sale of a capital asset. Petitioner paid the deficiency, then sued here.

Petitioner contends that the transfer by the Tenco stockholders of their Tenco stock to Minute Maid in exchange for Minute Maid stock, cash and notes, followed by the merger of Tenco into Minute Maid, were steps in a unified transaction qualifying as a reorganization under section 368(a) (1) (A) of the 1954 Code. Consequently, petitioner continues, the Minute Maid stock was received by it pursuant to the plan of reorganization and is nontaxable as such, while the cash and notes received constitute a dividend distribution to which the 85 percent intercorporate dividends received deduction is applicable. The Government asserts that the transfer of Tenco stock to Minute Maid was an independent sales transaction; therefore, the entire gain realized by petitioner on the payment to it of cash, notes and Minute Maid stock is taxable as gain from the sale of a capital asset.

I

*The Reorganization Issue*

The threshold issue is whether the transfer of Tenco stock to Minute Maid is to be treated for tax purposes as an independent transaction of sale, or as a transitory step in a transaction qualifying as a corporate reorganization. Significant tax consequences turn on which characterization is determined to be proper.

The general rule is that when property is sold or otherwise disposed of, any gain realized must also be recognized, absent an appropriate nonrecognition provision in the Internal Revenue Code.[2] One such nonrecognition

2. Sec. 1001. Determination of amount of and recognition of gain or loss.

(a) *Computation of gain or loss.*—The gain from the sale or other disposition of

property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess

provision, section 354(a) (1),[3] provides in pertinent part:

> No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.[4]

By its terms, this exception to the general rule of taxation depends for its operation on the existence of a corporate reorganization. The term "reorganization", moreover, is a word of art in tax law and is specifically defined in section 368(a) (1) as comprising six types of transactions, exclusively.

If—

■ The premise of the corporate reorganization provisions is that certain transactions constitute corporate readjustments and are not the proper occasion for the incidence of taxation. Congressional policy is to free from tax consequences those corporate reorganizations involving a continuity of business enterprise under modified corporate form and a continuity of interest on the part of the owners before and after, where there is no basic change in relationships and not a sufficient "cashing in" of proprietary interests to justify contemporaneous taxation.

It is not disputed that there was a Type A reorganization in April 1960 when Tenco and Minute Maid were merged in accordance with state law. Nor does the Government dispute that Minute Maid continued the business of Tenco following the merger, or that the former Tenco shareholders had a continuity of interest in the enterprise by virtue of their ownership of stock in Minute Maid received in the exchange. The disagreement centers on whether the initial exchange of stock was a step in a unified transaction pursuant to a "plan of reorganization"

The underlying theory of the petitioner's claim is that the tax consequences of business transactions are properly determined by their substance and not by the form in which they are cast. Thus petitioner views the substance of the transaction under review to be an acquisition by Minute Maid of Tenco's assets in exchange for transferring Minute Maid stock, cash and notes to Tenco's stockholders. See Rev.Rul. 67–274, 1967–2 C.B. 141; Commissioner of Internal Revenue v. Dana, 103 F.2d 359 (3d Cir. 1939); George Whittell & Co., 34 B.T.A. 1070 (1936). The value of the Minute Maid stock received, which exceeded 50 percent of the total consideration, constituted a sufficient continuity of interest to support a Type A reorganization.[5] Petitioner concludes, therefore, that the net result of the entire transaction is a reorganization, not to be altered by splitting the entire transaction into its component transitory steps. See Ber-

---

of the adjusted basis provided in such section for determining loss over the amount realized.

    *     *     *     *     *

Sec. 1002. Recognition of gain or loss. Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

3. All citations to Code sections hereinafter refer to the Internal Revenue Code of 1954.

4. In partial relaxation of this restrictive rule, section 356(a) (1) provides:

(A) section 354 * * * would apply to an exchange but for the fact that

(B) the property received in the exchange consists not only of property permitted by section 354 * * * to be received without the recognition of gain but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

5. In Rev.Rul. 66–224, 1966–2 C.B. 114, the Internal Revenue Service ruled that the continuity of interest requirement of section 1.368–1(b) is satisfied when, pursuant to a statutory merger, 50 percent of the consideration received by stockholders of the dissolved corporation is comprised of stock of the surviving corporation.

ner v. United States, 282 F.2d 720, 151 Ct.Cl. 128 (1960); Buhl v. Kavanagh, 118 F.2d 315, 320 (6th Cir. 1941); Helvering v. Alabama Asphaltic Limestone, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942). Petitioner's conclusion is justified in fact and in law.

The problem of deciding whether to accord the separate steps of a complex transaction independent significance, or to treat them as related steps in a unified transaction, is a recurring problem in the field of tax law.[6] The principle that even extended business transactions have determinate limits for tax purposes is based on a strong preference for "closed transactions" upon which to impose tax consequences. This preference is tempered, however, with respect for the integrity of an entire transaction. Accordingly, the essence of the step transaction doctrine is that an "integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together in attaching tax consequences". Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, p. 18 (1966); see also, Buhl v. Kavanagh, *supra*. The mere recitation of the doctrine, however, does not clarify the necessary relationship between the steps requisite to characterization as an integrated transaction.

Analysis of the reported cases and the diverse business transactions they encompass reveals that there is no universal test applicable to step transaction situations. See Anheuser-Busch, Inc., v. Helvering, 40 B.T.A. 1100 (1939), aff'd, 115 F.2d 662 (8th Cir. 1940), Cert. denied, 312 U.S. 699, 61 S.Ct. 739, 85 L.Ed. 1133 (1941); American Bantam Car Co. v. Commissioner of Internal Revenue, 11 T.C. 397 (1948), aff'd, 177 F.2d 513 (3d

Cir. 1949); cert. denied, 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950); South Bay Corp. v. Commissioner of Internal Revenue, 345 F.2d 698 (2d Cir. 1965); Commissioner of Internal Revenue v. Gordon, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968). It has been persuasively suggested that "the aphorisms about 'closely related steps' and 'integrated transactions' may have different meanings in different contexts, and that there may be not one rule, but several, depending on the substantive provision of the Code to which they are being applied". Mintz and Plumb, Step Transactions, pp. 247, 252–253 (1954).

In their attempt to define the criteria upon which application of step transaction principles depend, the courts have enunciated two basic tests. The "interdependence test" requires an inquiry as to "whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series". Paul and Zimet, Step Transactions, Selected Studies in Federal Taxation (2d Series, 1938), pp. 200, 254. See also, American Bantam Car Co. v. Commissioner of Internal Revenue, *supra*; ACF-Brill Motors Co. v. Commissioner of Internal Revenue, 14 T.C. 263 (1950), aff'd, 189 F.2d 704 (3d Cir. 1951); American Wire Fabrics Corp., 16 T.C. 607 (1951). The "end result" test, on the other hand, establishes a standard whereby:

> \* \* \* purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.[7]

---

6. In coping with this and related problems, courts have enunciated a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences.

7. Herwitz, Business Planning, p. 804 (1966). See also, Helvering v. Alabama

Despite the real differences between the tests, each is faithful to the central purpose of the step transaction doctrine; that is, to assure that tax consequences turn on the substance of a transaction rather than on its form.

█ In support of its position that the step transaction doctrine is inapplicable to the facts of this case the Government correctly points out that there was no binding commitment for the merger of Tenco to follow the acquisition of its stock. Defendant erroneously concludes, however, that the absence of such a commitment here renders the step transaction doctrine inapplicable. The binding commitment requirement relied upon by the Government, was enunciated by the Supreme Court in Commissioner of Internal Revenue v. Gordon, *supra*, at 96, 88 S.Ct. at 1524, wherein the Court said "if one transaction is to be characterized as a 'first step' there must be a binding commitment to take the later steps". Analysis of the statement in its proper context, however, dispels its application to the case before us. In *Gordon*, Pacific transferred certain of its assets to a new company, Northwest, in exchange for all of the latter's common stock, and debt paper. In 1961 Pacific distributed to its shareholders rights to purchase about 57 percent of Northwest's common stock at $16 per share, a price below its market value. Pacific notified its stockholders that "[i]t is expected that within about three years * * * the Company by one or more offerings will offer for sale the balance of such stock * * *." 391 U.S., at 97, 88 S.Ct., at 1525. In 1963 the remaining Northwest stock was offered to Pacific stockholders through distributed rights. Taxpayers were minority stockholders of Pacific who received rights in the 1961 distribution. Taxpayers sold four rights and exercised the balance, but they reported no income for the year 1961 from these transactions.

The primary issue in *Gordon* was whether the 1961 distribution was part of a Type D reorganization. To qualify as a D reorganization, Pacific must have distributed all or an amount constituting control (80 percent) of the Northwest stock. Sec. 355(a) (1) (D). In disposing of taxpayers' contention that the 1963 distribution (43 percent), taken in conjunction with the 1961 distribution (57 percent), satisfied the statutory requirement, the Supreme Court said at pp. 96–97, 88 S.Ct. at pp. 1524–1525:

* * * The Code requires that "the distribution" divest the controlling corporation of all of, or 80% control of, the controlled corporation. Clearly, if an initial transfer of less than a controlling interest in the controlled corporation is to be treated for tax purposes as a mere first step in the divestiture of control, it must at least be identifiable as such at the time it is made. Absent other specific directions from Congress, Code provisions must be interpreted so as to conform to the basic premise of annual tax accounting. It would be wholly inconsistent with this premise to hold that the essential character of a transaction, and its tax impact, should remain not only undeterminable but unfixed for an indefinite and unlimited period in the future, awaiting events that might or might not happen. This requirement that the character of a transaction be determinable does not mean that the entire divestiture must necessarily occur within a single tax year. It does, however, mean that if one transaction is to be characterized as a "first step" there must be a binding commitment to take the later steps.

Here, it was little more than a fortuity that, by the time suit was brought alleging a deficiency in taxpayers' 1961 returns, Pacific had distributed the remainder of the stock. * * *

Asphaltic Limestone, *supra*; Anheuser-Busch v. Helvering, *supra*; South Bay

Corp. v. Commissioner of Internal Revenue, *supra*.

The opinion in *Gordon* contains not the slightest indication that the Supreme Court intended the binding commitment requirement as the touchstone of the step transaction doctrine in tax law. Nor is there any indication that the Court intended to overrule any prior decisions applying the step transaction doctrine to other types of transactions where there were no binding commitments. On the contrary, the opinion addressed a narrow situation (a D reorganization) involving a specific statutory requirement (divestiture of control), and limited the potential for dilution and circumvention of that requirement by prohibiting the indefinite extension of divestiture distributions. Its interpretation should be so limited.[8] Clearly, the step transaction doctrine would be a dead letter if restricted to situations where the parties were *bound* to take certain steps.

The doctrine derives vitality, rather, from its application where the form of a transaction *does not require* a particular further step be taken; but, once taken, the substance of the transaction reveals that the ultimate result was intended from the outset. See Anheuser-Busch, Inc., v. Helvering, *supra*; Chase v. Commissioner of Internal Revenue, 44 B.T.A. 39 (1941), aff'd, Helvering v. Chase, 128 F.2d 740 (2d Cir. 1942) ; Edith G. Goldwasser, 47 B.T.A. 445 (1942), aff'd, 142 F.2d 556 (2d Cir. 1944). In the majority of cases, it is the Government that relies on the step transaction doctrine for tax characterization. General application of the binding commitment requirement would effectively insure taxpayers of virtual exemption from the doctrine merely by refraining from such commit-ments. Such an untoward result cannot be intended by the *Gordon* opinion; indeed, defendant acknowledges as much in its brief by stating "the Supreme Court seems to have restricted the step transaction doctrine at least in one type of transaction, a corporate distribution of stock in a controlled corporation".[9] The present case involves no such transaction.

In the alternative, the Government asserts that the step transaction doctrine has no application to this case because the merger of Tenco into Minute Maid was not the intended end result from the outset. Although the appropriate standard is invoked, defendant's assertion is inconsistent with the inferences to be drawn from the record.

The operative facts emerging from the record in this case suggest that Minute Maid, desirous of diversifying its operations in order to stabilize its income, was presented with the opportunity to acquire the entire stock of Tenco for a bargain "price". Tenco's record of financial success and its asking price for Tenco stock of seven or eight times its earnings (while *other companies were asking 20 times their earnings*), without more, constituted an attractive investment. After the stock acquisition, moreover, Minute Maid was at liberty to operate Tenco as a wholly owned subsidiary, if it so desired. There is no persuasive evidence, however, that Minute Maid's appetite was limited to these goals, though worthy, when there was more in sight. On the contrary, the record reveals that, prior to the acquisition of Tenco stock, the officers of Minute Maid considered merging *its existing subsidiaries into*

---

6. See Mintz v. Plumb, *supra*, at 285, where in regard to the similarly restrictive interdependence test it is concluded:

> [The interdependence test] applies * * * in cases * * * where the concept of a "plan or reorganization" is not pertinent. In reorganization cases, except possibly in applying the "control" requirement * * * the determinative test seems to be whether the step was intended, or even contemplated as an alternative possibility, under the

plan or reorganization, and the test of "interdependence" has not been applied.

9. The half-hearted nature of defendant's attempt to apply the binding commitment rule here is further revealed in its effort to distinguish several petitioner-cited *cases* by stating "[those] courts found precisely what is in dispute here, that the first steps were *intended* to be followed by later ones".

the parent in order to eliminate some of the general ledgers and extra taxes, and to bring about other savings. In fact, the merger of subsidiaries as a money-saving device was Mr. Speeler's (Minute Maid's vice president and general counsel) pet idea, which he discussed with Minute Maid's President Fox before the initial agreement with Tenco.

Shortly after the stock acquisition, Minute Maid instituted steps to consummate the merger of Tenco into Minute Maid. The proposed merger was motivated by a desire to avoid additional income tax on intercorporate dividends, to eliminate duplicate costs in the approximate amount of $50,000, and to obtain a stepped-up basis for stock in foreign corporations and other assets owned by Tenco. The potential step-up in basis for the foreign stock was estimated at $750,-000 and the step-up for Tenco's other assets, although unable to be precisely ascertained, was considerable and probably sufficient as a justification for the merger independent of the other assigned reasons.[10]

Minute Maid applied for on January 5, 1960, and received on February 25, 1960, a ruling by the Internal Revenue Service that Minute Maid's basis in property received upon the complete liquidation of Tenco would be determined under section 334(b) (2) by reference to the adjusted basis of Tenco stock in Minute Maid's hands. Subsequently, on April 30 and May 2, 1960, in accordance with applicable state laws, Tenco and certain other subsidiaries were merged into Minute Maid.

No express intention on the part of Minute Maid to effect a merger of Tenco surfaces in the record until after the initial agreement to exchange stock. It strains credulity, however, to believe other than that the plan to merge was something more than inchoate, if something less than announced, at the time of such exchange. One gains the impression that the record of intentions is edited, so in reconstruction we must lean heavily on the logic of tell-tale facts and lightly on chameleon words. It is difficult to believe that sophisticated businessmen arranging a multimillion dollar transaction fraught with tax potentials were so innocent of knowledge of the tax consequences as the testimony purports. Perhaps testimony from private tax authorities serving the parties would have yielded more explicit knowledge of the questions asked and the advice given, but a trial record is rarely perfect in retrospect and a decision must be reached on an objective appraisal of the facts, including the inferences to be squeezed from them.

The operative facts in this case clearly justify the inference that the merger of Tenco into Minute Maid was the intended result of the transaction in question from the outset, the initial exchange of stock constituting a mere transitory step. Accordingly, it is concluded that the initial exchange and subsequent merger were steps in a unified transaction qualifying as a Type A reorganization, and that petitioner received its Minute Maid stock pursuant to the plan of reorganization shown by the facts and circumstances above to have existed.[11]

## II

### The Dividend Issue

Pursuant to the plan of reorganization, petitioner received $281,564.25 in cash, $239,329.40 in promissory notes, and Minute Maid stock valued at $541,-717. Section 356(a) (1), *supra*, provides

---

10. Petitioner asserts that the potential step-up in basis of Tenco assets is approximately $5,525,000. There is also evidence that Minute Maid believed such step-up to be approximately $5,950,000. The actual step-up, though undisclosed by the available facts, is probably at least several million dollars.

11. A formal plan or reorganization is not necessary if the facts of the case show a plan to have existed. See William H. Redfield, 34 B.T.A. 967 (1936).

that the *amount* of gain realized by petitioner must also be recognized, but not in excess of the cash and notes (i. e., "boot") received. With respect to the *character* of petitioner's recognizable gain, section 356(a) (2) provides:

> If an exchange is described in paragraph (1) but *has the effect of the distribution of a dividend*, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property. (Emphasis supplied.)

The interpretation initially placed upon the pivotal phrase contained in section 356(a) (2) and its predecessor [12] has drawn much criticism. See generally Darrell, The Scope of Commissioner v. Bedford Estate, 24 Taxes 266 (1946); Wittenstein, Boot Distributions and Section 112(c) (2): A Re-Examination, 8 Tax.L.Rev. 63 (1952). The result has been a reevaluation by the courts of the standard contained in section 356(a) (2). In Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611 (1945), pursuant to a plan of recapitalization qualifying as a reorganization, preferred stock was exchanged for new preferred stock, common stock and cash. In holding that the cash received was taxable as dividend income, the Supreme Court said at page 291, 65 S.Ct. at p. 1161:

> * * * It has been ruled in a series of cases that where stock of one corporation was exchanged for the stock of another and cash and then distributed, such distributions out of earnings and profits had the effect of a distribution of a taxable dividend under [the predecessor of section 356 (a) (2)]. * * *.

To the same effect, see Rev.Rul. 56–220, 1956–1, C.B. 191.

The so-called "automatic dividend" approach generally attributed to the *Bedford* opinion, whereby section 356(a) (2) automatically converts any recognized gain into dividend income to the extent of the shareholder's ratable share of the transferor corporation's earnings and profits, has been narrowly restricted by most of the more recent decisions. See Idaho Power Co. v. United States, 161 F. Supp. 807, 142 Ct.Cl. 534, cert. denied, 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958); Hawkinson v. Commissioner of Internal Revenue, 235 F.2d 747 (2d Cir. 1956); Ross v. United States, 173 F. Supp. 793, 146 Ct.Cl. 223 (1959), cert. denied, 361 U.S. 875, 80 S.Ct. 138, 4 L.Ed. 2d 113 (1959). The operative words of section 356(a) (2) suggest a test of "dividend equivalence", rather than a conclusion of automatic dividend income merely because of the existence of earnings and profits, and the more recent cases have recognized this. In Ross v. United States, *supra*, this court stated:

> * * * The ultimate question finally narrows down to whether the payment had the effect of a distribution of a dividend under § 356(a) (2).

> The answer to that question depends on all the facts and circumstances surrounding the distribution. * * *.

The problem of dividend equivalence usually arises in reorganization cases under § 356 * * * and in redemption cases under § 302 * * *. The phrase "has the effect of the distribution of a dividend" in § 356 and its predecessor is in *pari materia* with the phrase "essentially equivalent to a dividend" as used in § 302 and its predecessor. * * *. 173 F.Supp. 796, 146 Ct.Cl. 228 (1959).

Thus, despite the absence of an express statutory relationship between the two Code provisions, the principles developed under section 302 have been used with

---

12. Section 356(a) (2) of the 1954 Code is identical in substance with its predecessor, section 112(c) (2) of the 1939 Code.

See S.Rep.No.1622, 83d Cong., 2d Sess., 269 (1954), U.S.Code Cong. & Admin. News 1954, p. 4629.

increased frequency in applying the standard contained in section 356(a)(2). See Ross v. United States, *supra*; Hawkinson v. Commissioner of Internal Revenue, *supra*.

There can be little doubt, on the facts of the present case, that the receipt of boot by petitioner was essentially equivalent to a dividend. Defendant has conceded this by implication in declining to contest the issue in it brief. The amount of cash, promissory notes and Minute Maid stock, respectively, received by each of the Tenco stockholders was in direct proportion to his ownership of Tenco stock. The distribution on a pro rata basis, entailing no substantially disproportionate change in the continuing equity interests of the Tenco stockholders, constitutes a classic example of a transaction having the effect of the distribution of a dividend. See Boyle v. Commissioner of Internal Revenue, 14 T.C. 1382 (1950), aff'd, 187 F.2d 557 (3d Cir. 1951), cert. denied, 342 U.S. 817, 72 S.Ct. 31, 96 L.Ed. 618 (1951); Commissioner of Internal Revenue v. Roberts, 203 F.2d 304 (4th Cir. 1953); S.Rep. No.1622, 83d Cong., 2d Sess., 49 (1954); Treas.Reg. § 1.302–2(b). Accordingly, the gain recognizable under section 356 (a)(1) by petitioner upon its receipt of boot is characterized under section 356(a)(2) as (1) dividend income to the extent of petitioner's ratable share of Tenco's accumulated earnings and profits, and, (2) capital gain to the extent of any remaining recognizable gain.[13]

## III

### *The Deduction Issue*

Section 243(a) provides, in parts pertinent to this suit, that:

In the case of a corporation, there shall be allowed as a deduction an amount equal to the following percentages of the amount received as dividends from a domestic corporation which is subject to taxation under this chapter:

(1) 85 percent, in the case of dividends other than dividends described in paragraph (2) or (3); * * *.

It has been decided above that the gain recognizable by petitioner upon its receipt of boot is characterized under section 356(a)(2) as dividend income to the extent of petitioner's ratable share of Tenco's accumulated earnings and profits. Thus, it is now concluded that petitioner is entitled under section 243(a)(1) to a dividends received deduction in the amount of 85 percent of the dividend portion of its recognizable gain.

In Rose v. Little Inv. Co., 86 F.2d 50 (5th Cir. 1936), cash and notes were distributed by a domestic corporation to the taxpayer (a corporate stockholder) pursuant to a plan of reorganization. In deciding that the boot received had the "effect of the distribution of a taxable dividend" entitling the taxpayer to a dividends received deduction, the court stated at page 51:

* * * But taxing as a dividend to each distributee what is thus received may have very different final results. Individuals with large incomes will owe a surtax because of it. Other individuals with less incomes or greater deductions and exemptions will owe no tax. Corporations, because of their special dividend deduction, will owe none. The unequal result as to corporations is rooted in the deduction provision of section 234(a)(6) which by the provision under discussion is made to apply, not only to true dividends, but also to this quasi dividend. * * *

The applicable gain characterization provision in Rose (§ 203(d)(2) of the 1924 Revenue Act) is identical in substance with section 356(a)(2) of the 1954 Code, and the applicable deduction provision (§ 234(a)(6) of the 1924 Revenue Act), which allowed a 100 percent dividends received deduction is analo-

---

13. The determination of the amount of Tenco's accumulated earnings and profits available in 1959 for the distribution of a dividend to the Tenco stockholders has been deferred at defendant's request to a later date.

gous to the current section 243(a) (1) which allows an 85 percent deduction.

Similarly, in Commissioner of Internal Revenue v. Forhan Realty Corp., 75 F.2d 268 (2nd Cir. 1935), the taxpayer (a corporate stockholder) received cash pursuant to a plan of reorganization. In holding that the taxpayer's gain was includable in gross income as a dividend, though not taxable to the taxpayer as such, the court remarked at page 269:

> * * * where the distribution has the effect of what is ordinarily considered a taxable dividend, from the distributing corporation's viewpoint, section 112(c) (2) is applicable to the entire distribution, without regard to whether there is a possibility of parts of the distribution going to some distributees which parts, if viewed as ordinary dividends, would be nontaxable to such distributees either because the distributees are corporations or because they have not sufficient income to be subject to surtax.
>
> The respondent [taxpayer] is a corporation, and therefore not taxable on dividends received. * * *.

Again, the pertinent tax provisions in Forhan (§§ 112(c) (2) and 23(p) of the 1928 Revenue Act) are not substantively distinguishable from their counterparts in the 1954 Code. See also S.Rep.No. 1622, 83d Cong., 2d Sess., 250 (1954).

A careful review of the relevant cases, statutory provisions and their legislative histories reveals no theory upon which a corporation deemed to have received a dividend under section 356(a) (2) is not entitled to the 85 percent dividends received deduction provided by section 243 (a) (1). Defendant apparently recognizes this, declining to contest this issue as well in its brief. The legislative history of section 243(a) (1) and its predecessors discloses a congressional policy against double taxation of income by permitting dividends received deductions to corporation on "the theory that a corporate tax has already been paid upon the earnings out of which the dividends are distributed". H.Rep.No.708, 72d Cong.,

1st Sess., 12 (1932). Moreover, that portion of the dividend distribution which is presently not taxable to petitioner will be taxable to petitioner's individual stockholders when distributed to them. Acccordingly, it is decided that petitioner is entitled to the 85 percent dividends received deduction provided by section 243(a) (1) for that part of its recognizable gain characterized by section 356(a) (2) as dividend income.