**Ben J. MASSELL, Jr.**

v.

**UNITED STATES of America.**

Civ. A. No. C 74–991 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 14, 1976.

---

Walter Akerman, Jr., W. Douglas Kerr, Atlanta, Ga., for plaintiff.

William D. Mallard, Jr., Asst. U. S. Atty., Atlanta, Ga., John A. Townsend, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

### ORDER

JAMES C. HILL, District Judge.

This is a tax case. On April 3, 1972, the defendant assessed a deficiency in income taxes for the year 1968 against the plaintiff in the principal amount of $80,632.35, with interest of $14,362.49. The plaintiff paid the tax and interest assessed and has now instituted this suit for refund. Jurisdiction is conferred upon this Court by Title 28, United States Code, Section 1346(a)(1). The case is ripe for decision on cross-motions for summary judgment.

The facts have been stipulated. Ben Massell, Sr., plaintiff's father, died on September 9, 1962. Two trusts were created under his will. The first was the Marital Trust, so named because its purpose was to qualify the estate for the marital deduction in computing the federal estate tax. Plaintiff's step-mother was to receive the income from the Marital Trust for life and was given a testamentary power of appointment over the corpus of the Trust. In lieu of her exercise of this power of appointment, the corpus of the Marital Trust was to go at her death to the Residuary Trust, the second of the trusts under Mr. Massell's will. The beneficiaries of the Residuary Trust were plaintiff and his sister and their descendants.

On December 29, 1965, plaintiff and his sister purchased their step-mother's life interest in the Marital Trust and secured her release from the power of appointment over the corpus. Thereafter, the beneficiaries of the Marital Trust were the plaintiff and his sister pursuant to the pour-over provisions of the Marital Trust.

As of January, 1967, the Marital Trust owned various assets, one of which was stock in Steve-Cathy, Inc. Steve-Cathy, Inc., in turn, owned 200 shares of West Peachtree Corporation whose principal asset was a commercial building in Atlanta. The remaining 500 shares of West Peachtree were owned by the Massell Companies. The Massell Companies owned substantial commercial realty throughout the Atlanta area. Both West Peachtree and the Massell Companies were in the business of renting commercial real estate. At all times pertinent hereto, plaintiff was the owner of 100 percent of the outstanding common stock of the Massell Companies.

In December, 1967, the shareholders of Steve-Cathy, Inc., which included the trustees of the Marital Trust, decided to liqui-

date the corporation. Upon liquidation, which was effected on January 2, 1968, the Marital Trust became the owner of the 200 shares of West Peachtree.

Concurrently with the decision in December, 1967, to liquidate Steve-Cathy, Inc., the trustees of the Marital Trust decided to sell the 200 shares of West Peachtree which the Trust would receive upon liquidation. The logical purchaser was the plaintiff or one of his corporations, since the Massell Companies owned the remaining interest in West Peachtree. Moreover, since West Peachtree's principal operating asset, a commercial building, was losing its prime tenant, it was then expected that the operating assets would be generating substantial operating losses for an indefinite period. It would, therefore, be desirable tax wise to align those operating assets with other income producing assets, such as the Massell Companies, so that the expected operating losses could be used to offset taxable income.

So, in December, 1967, the trustees of the Marital Trust granted to plaintiff and/or the Massell Companies a revokable option to purchase the West Peachtree stock for $107,798.58, the estimated net value of the assets represented by the Trust's 200 shares. The option was to be exercised within six months.

The tax advisors for both the Trust and the plaintiff soon thereafter determined that a sale by the Trust to the Massell Companies would be unacceptable because the sale proceeds would probably be taxable to the Trust as ordinary income. Since the plaintiff was a beneficiary of the Marital Trust, the Trust would be treated by attribution as the owner of the Massell Companies, and, hence, a sale to the Massell Companies would be treated as a taxable redemption under Section 304 of the Internal Revenue Code of 1954 (the "Code").

The decision was therefore made to have the plaintiff purchase the West Peachtree stock individually, and he did so on February 15, 1968. After this purchase, the plaintiff *still* desired to align the operating assets of West Peachtree with the operat-

ing assets of the Massell Companies so that the expected losses from West Peachtree's operating assets could be utilized. Moreover, the plaintiff desired to recoup his cash outlay for the West Peachtree stock that he had just purchased.

These objectives might have been achieved by having the Massell Companies or West Peachtree purchase the plaintiff's 200 shares of West Peachtree stock, and then either liquidating West Peachtree or filing consolidated returns. The plaintiff's tax advisor, an astute and knowledgeable tax lawyer, undoubtedly knew that the tax consequences of such a sale would not be pleasant for his client.

The plaintiff's tax advisor devised an arrangement which, it was hoped, would achieve both of the plaintiff's objectives. Pursuant to that arrangement, on June 26, 1968, the plaintiff caused the Massell Companies to purchase an additional 400 shares of treasury stock of West Peachtree for $215,597.16. This purchase increased the Massell Companies' ownership of West Peachtree from 71.4 percent to 81.8 percent. Then, the plaintiff caused West Peachtree to liquidate, distributing $107,798.58 cash to the plaintiff in redemption of his 200 shares and distributing the remainder of West Peachtree's assets to the Massell Companies in redemption of its 900 shares. The cash required to redeem the plaintiff's 200 shares had been obtained from the Massell Companies in the sale of the 400 treasury shares.

As expected, the operating assets of West Peachtree did generate substantial operating losses which were used by the Massell Companies to offset otherwise taxable income. At all times here pertinent, West Peachtree and the Massell Companies had earnings and profits exceeding $107,798.58.

In its tax return for fiscal year ending June 30, 1969, the Massell Companies treated the properties it received in the liquidation of West Peachtree as being received in a nontaxable liquidation of an 80 per cent owned subsidiary, pursuant to Section 332 of the Internal Revenue Code.

In his tax return for 1968, the plaintiff reported his receipt of cash in the West Peachtree liquidation as a capital transaction in which he realized neither gain nor loss because his basis in the stock equaled the cash received. Upon audit of that return, the Commissioner determined that the entire amount of cash received by the plaintiff should be taxed at ordinary income rates. A deficiency was assessed. After paying the deficiency, the plaintiff filed a claim for refund and, upon its denial, filed the instant action.

Resolution of the dispute herein centers around two sections of the Internal Revenue Code of 1954, 26 U.S.C. § 1 *et seq.*

§ 304. *Redemption through use of related corporations*

(a) *Treatment of certain stock purchases*—

(1) *Acquisition by related Corporation (other than subsidiary).*—For purposes of sections 302 and 303, if—

(A) one or more persons are in control of each of two corporations, and

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph [2] applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

§ 331. *Gain or loss to shareholders in corporate liquidations*

(a) *General rule*—

(1) *Complete liquidations.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

The issue in this case is whether the distribution of $107,798.58 in cash to plaintiff in redemption of his 200 shares of the stock of West Peachtree Corporation is properly to be treated as a sale of the shares under Section 331 of the Code or as a dividend under Section 301. If it was a dividend, the cash is taxable as ordinary income; if it was not a dividend, the cash received is not taxable as plaintiff is entitled to offset his cost basis in the stock against the cash before being taxed on any income.

Certain principles of the tax law are so well established that their recitation is almost unnecessary. A taxpayer has the legal right to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits. *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 599 (1935); *Commissioner v. Tower*, 327 U.S. 280, 288, 66 S.Ct. 532, 536, 90 L.Ed. 670, 676 (1946). The taxpayer's motive to avoid taxation will not establish liability if the transaction does not do so without it. *Zenz v. Quinlivan*, 213 F.2d 914 (6th Cir. 1954). However, the substance rather than the form of a transaction determines its tax consequences, particularly if the form is merely a convenient device for accomplishing indirectly what could not have been achieved by the selection of a more straightforward route. *Crenshaw v. United States*, 450 F.2d 472 (5th Cir. 1971), *cert. denied*, 408 U.S. 923, 92 S.Ct. 2490, 33 L.Ed.2d 333 (1972). Transparent devices totally devoid of any non-tax significance to the parties cannot pass muster even though a literal reading of the statutory language might suggest otherwise. *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 266–67, 78 S.Ct. 691, 695, 2 L.Ed.2d 743, 748–49 (1958). To permit otherwise would seriously impair the effective administration of the tax policies of Congress. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981, 985 (1945). Thus, the Court is required to look to the economic substance of the instant transaction. As stated by the Fifth Circuit in *Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185, 1192 (1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1970):

"But the solution of hard tax cases requires something more than the easy

generalization that the substance rather than the form of a transaction is determinative of its tax effect. *Gregory* should not be considered a 'talisman of magical powers', since in numerous situations the form by which a transaction is effected does influence or control its tax consequences. *Edwards v. Commissioner*, 10 Cir. 1969, 415 F.2d 578."

Finally, the tax consequences of an interrelated series of transactions are not to be determined by viewing each of them in isolation but by considering them together as component parts of an overall plan. The individual tax significance of each step is irrelevant when, considered as a whole, they all amount to no more than a single transaction which in purpose and effect is subject to the given tax consequence. *Crenshaw v. United States, supra.* As set out in *King Enterprises, Inc. v. United States*, 418 F.2d 511, 516, 189 Ct.Cl. 466 (1969):

> "In their attempt to define the criteria upon which application of step transaction principles depend, the courts have enunciated two basic tests. The 'interdependence test' requires an inquiry as to 'whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series'. (cits). The 'end result' test, on the other hand, establishes a standard whereby:
>
>> . . . purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result[s]. (cits)" (footnote omitted)

With these principles in mind we proceed to the case at hand.

Generally speaking, the defendant contends that we have here the classic dividend distribution to shareholders from prior corporate earnings, while leaving unaffected the shareholder's control, economic interests, and rights in the ongoing corporations.

Thus, at the beginning of the pertinent series of events—that is, immediately after the plaintiff had purchased the stock from the Marital Trust—the plaintiff owned 100 per cent of both corporations either directly or indirectly, and the corporations' operating assets were in corporate solution. At the end of the series of events, the operating assets remained in corporate solution, with no diminution in the plaintiff's control, economic interests, and rights. The only change effected, says defendant, was that the plaintiff had extracted $107,798.58 in cash from the Massell Companies.

The plaintiff seeks to demonstrate that the transactions involved in this case constituted a redemption in complete liquidation of a corporation and that there was not, in substance, a dividend to plaintiff in this case. Plaintiff accuses the defendant of attempting to impermissibly select out only those steps in the transaction upon which defendant believes that it may weave some dubious theory of taxability. Plaintiff argues that when all of the steps are collapsed it appears that the Marital Trust received the sum of $107,798.58 in complete termination of its interest in West Peachtree and the operating assets of that corporation were combined with those of the Massell Companies upon the liquidation of West Peachtree. Thus, at the outset the plaintiff possessed cash in the amount of $107,798.58; he owned all of the net assets of the Massell Companies in corporate form; and by virtue of the Massell Companies ownership of five-sevenths of the stock of West Peachtree, he owned five-sevenths of the net assets of that corporation. After the series of transactions herein, plaintiff had cash in the amount of $107,798.58; he possessed all of the net assets of the Massell Companies in corporate form; and he now owned five-sevenths of the net assets of West Peachtree by virtue of direct ownership through the Massell Companies. Therefore, plaintiff concludes that the economic realities of these transactions are totally inconsistent with any normal concept of a dividend.

A few things seem clear in this case. The Massell Companies is out $107,798.58 in

cash. The Marital Trust has $107,798.58 in cash. The Massell Companies now owns the operating assets of West Peachtree and may utilize the operating losses generated by those assets to offset its income. Plaintiff owns 100 percent of the Massell Companies. Plaintiff is also a beneficiary under the Marital Trust.

After rather extended consideration of this case the Court set the matter down for oral argument. In a letter to counsel the Court briefly outlined its thinking at the time and raised several questions which the Court considered relevant to a final determination. Very able counsel for both sides appeared at the conference and a thoroughly enlightening session followed. The Court apprehends that there are two main lines of discussion which must be explored in order to resolve this dispute.

The first problem in this case lies in the correct application of the step-transaction doctrine. The Court is of the opinion that the relevant series of events in this case began with the plaintiff's decision to purchase the 200 shares of stock from the Marital Trust. Thus, prior to the time that the plaintiff became the owner of the 200 shares of West Peachtree previously owned by the Marital Trust, he intended or had in mind the eventual combination of West Peachtree and the Massell Companies. This is not to say that the combination of the two corporations was his only purpose in deciding to buy the stock. Obviously, as a beneficiary of the Marital Trust, he was certainly interested in having the Trust hold profitable assets. However, the Court is of the opinion that the advantages of combining the two corporations would not have been lost to an able and astute tax advisor and tax advisors played no small part in this entire series of events. Therefore, in viewing the totality of the circumstances in this case the purchase of the West Peachtree stock by the plaintiff from the Marital Trust is to be included.

This conclusion is somewhat contrary to the government's position and the position taken in an earlier opinion of this Court. The government argues that the plaintiff may have intended to combine the two cor-

porations from the outset, but that his decision to withdraw cash from the deal was only made at a later time. The Court is not willing to accept this narrow interpretation of the step-transaction doctrine. The position taken by the government would mean that in order for a taxpayer to take advantage of the step-transaction doctrine, he would have had to have planned each specific step in advance or else the government wins. Thus, in this case the plaintiff would prevail so long as at the outset he intended to complete the series of events by receiving cash from the corporation as one of those events. But, since he arguably only decided to receive cash at a later point in time, he is estopped from including the receipt of cash as one of the steps. The step-transaction doctrine is not so limited in its application. The design of the doctrine is to look to the net effect or economic realities of a situation. The reality of the events in this case is that the plaintiff desired from the outset to combine the operating assets of the two corporations. The Court is of the opinion that the mere fact that the plaintiff had not finally decided on the specifics of how to complete the series prior to the point in time when the series began does not foreclose a route which under other circumstances might result in taxation. As the Court pointed out in an earlier opinion, if the plaintiff had pursued the course which he did in this case *after* he became the owner of the 200 shares of stock in an *unrelated* transaction, then the result might be that under section 304 he would be taxed on the entire amount. The simple fact in this case is that the purchase of the stock from the Marital Trust was part and parcel of the later receipt of cash by the plaintiff.

Furthermore, from the record in this case it is not at all clear that the plaintiff did not intend at least to attempt to get his cash outlay back from the very beginning. Thus, his tax advisor advised the plaintiff to purchase the stock individually *if he could*. Once the purchase was made, the parties have stipulated that the plaintiff was desirous of recouping his cash outlay *if he could*. It is true that the proposals of-

fered by the plaintiff's tax advisors did not include one in which the plaintiff was to receive his money back. However, under the circumstances the Court is of the opinion that a fair inference from the record is that due to his cash flow position that the receipt of cash was a distinct possibility from the outset.

From the foregoing it thus appears that the plaintiff in this case had the intention of combining the two corporations at the very outset of the series of events in this case. The net effect of the actions taken in the case was that the Massell Companies, wholly owned by the plaintiff, purchased the 200 shares of West Peachtree stock from the Marital Trust. Of course, it appears that the Trustees of the Marital Trust had given an option to the plaintiff and/or the Massell Companies to purchase the stock. However, upon learning that the tax consequences to the Trust of a sale of the stock to the Massell Companies would be horrid, the Trustees evidently revoked the option extended to the Massell Companies. Thus, the Trustees of the Marital Trust had no intention of having the 200 shares of West Peachtree stock purchased by the Massell Companies.

The plaintiff in this case finds himself in a rather unenviable position. On the one hand he asserts that the purchase of the West Peachtree stock by him from the Marital Trust was a part of the series of events culminating in the combination of the two corporations. On the other hand he contends that the Trustees of the Marital Trust would never have sold the stock to the Massell Companies, and, therefore, no adverse tax consequences should flow to the Trust.

The plaintiff's problem is that he was a major beneficiary of the Marital Trust. As an individual purchaser, the plaintiff wishes to have the Court believe that the purchase of the stock by him was an integral part of the series of events leading up to the ultimate combination of the two corporations. Yet, as a major beneficiary of the Marital Trust, the plaintiff would have the Court believe that he—through the Trustees of

the Marital Trust—would have taken no part in such a deal. The plaintiff simply asks too much.

It is clear that had the Marital Trust sold the stock directly to the Massell Companies the application of section 304 would have taxed the proceeds as ordinary income. The plaintiff argues that such results only upon a *mechanical* application of the statute. The "mechanical" application of tax statutes is not a new concept and, as will be shown, the application of the statute in this case makes perfectly good sense.

■ The plaintiff in this case owned 100 percent of the stock of Massell Companies at all times pertinent to this suit. At the outset the Massell Companies owned five-sevenths of the stock of West Peachtree and, of course, plaintiff thus owned by attribution five-sevenths of West Peachtree. The Marital Trust owned two-sevenths of the stock of West Peachtree. Under section 318 of the Code stock owned by a trust is considered owned by its beneficiaries in proportion to the actuarial interest in such beneficiary in the trust. 26 U.S.C. § 318(a)(2)(B)(i). The plaintiff is an approximately 50 percent beneficiary of the Marital Trust. Therefore, the plaintiff was the owner of one-seventh of the stock of West Peachtree via the Marital Trust. At the end of the pertinent series of events in this case the plaintiff had cash in hand amounting to the value of two-sevenths of the stock of West Peachtree even though he already owned six-sevenths of West Peachtree in the beginning. In effect, the plaintiff caused his wholly owned corporation to purchase one-sixth of the stock of West Peachtree that he already owned. Consequently, under section 304 the amount which the plaintiff received for this one-seventh interest in West Peachtree is taxable as ordinary income.

Upon reflection this result is not only proper under the taxing statutes, but it also is fair and equitable. One tends to become a little worried when this combination is reached for fear that the two are simply exclusive of one another. However, in this case it is apparent that the plaintiff was the

individual in control of the events taking place. As a beneficiary of the Marital Trust, it was certainly to his advantage to have the Trust sell stock which was soon to become a liability. As owner of the Massell Companies and a substantial owner of West Peachtree, it was to his advantage to combine the two corporations. Of course, the mere fact that these events were to his advantage does not mean that he necessarily should be taxed. However, it is clear in this case that the plaintiff was the recipient of cash from his wholly owned corporation to the extent of a one-seventh interest in West Peachtree which, in effect, he bought from himself.

Finally, plaintiff argues that this result is inequitable because he will lose the value of his purchase price of the stock. The Court is unable to see how that follows. The Marital Trust had a basis in the stock of $107,798.58. Under section 304 the stock acquired by the Massell Companies in a 304 transaction is treated as having been acquired as a contribution to the capital of the corporation. Logically, the plaintiff's basis for his remaining stock would seem to be increased to the extent that section 304 applies to the purchase here in issue. *See* 26 U.S.C. § 362(a).

The plaintiff also contends that the distribution here in question was in complete liquidation of West Peachtree Corporation and clearly within the language of Section 331 of the Internal Revenue Code. The Court disagrees. As stated in *Davant v. Commissioner,* 366 F.2d 874 (5th Cir. 1966), *cert. denied,* 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967):

> "In only one situation does the Code intend that a taxpayer should be allowed to receive the earnings and profits of his corporation without running the gauntlet of 301–316 or the equivalent boot provisions. That is where the taxpayer intends to stop employing the corporate form in administering that business, i. e., a bona fide complete liquidation under section 331 or its equivalent, where taxpayer sells all of his stock in a corporation

and terminates his proprietary interest in those assets."
366 F.2d at 880 n.15.
And further,
> "[t]hose provisions contemplate that operating assets will no longer be used by the stockholders to carry on the business as a corporation. It has long been recognized that taxpayers cannot liquidate a corporation with the intention of immediately reincorporating it in order to hold back liquid assets and cash for the purpose of getting capital gains treatment or to obtain a stepped-up basis for the operating assets or to wipe out old earnings and profits or other tax attributes. Such a liquidation reincorporation transaction does not qualify for section 331 treatment. . . .

> Petitioners never intended to give up the corporate form of doing business. At all times relevant their intention was to transfer Warehouse's operating assets to Water. Water and Warehouse were owned by identical shareholders with identical distribution of shares. At no time did the petitioners' interest in the operating assets change. Most of the reported cases involve situations where the stockholders create a new corporate shell to receive the assets, but we see no difference between a liquidation followed by a transfer to a new corporate shell and a liquidation followed by a transfer to an already existing corporate shell."

Thus, prior to the "liquidation" here in question the plaintiff owned 100 percent of the operating assets of the Massell Companies and six-sevenths of the operating assets of West Peachtree. After the "liquidation" plaintiff was the owner of all of the operating assets of both corporations in corporate solution. This "liquidation" does not "intrinsically partake of the elements which underlie the Congressional exemption" from ordinary gains tax treatment in Section 331. *Bazley v. Commissioner,* 331 U.S. 737, 742, 67 S.Ct. 1489, 1491, 91 L.Ed. 1782, 1787 (1947).

In conclusion, the plaintiff as a beneficiary under the Marital Trust is taxable to

the extent of his interest in the Marital Trust. The parties are directed to recompute the amount of tax payable by the plaintiff in conformity with this opinion and submit such recomputation to the Court within twenty (20) days of the filing date of this order.