36 F.3d 1116
 74 A.F.T.R.2d 94-6385
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
The HEARST CORPORATION, Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 93-5160.
 United States Court of Appeals, Federal Circuit.
 Sept. 15, 1994.
 
 Before RICH, PLAGER, and SCHALL, Circuit Judges.
 PLAGER, Circuit Judge.
 
 
 1
 This is a tax refund case involving the issue of the proper valuation of a charitable contribution of a valuable film library. The Hearst Corporation (Hearst) appeals the judgment of the Court of Federal Claims (CFC)[1] entered May 5, 1993 dismissing Hearst's complaint. Hearst Corp. v. United States, 28 Fed.Cl. 202 (1993). We vacate and remand.
 
 BACKGROUND
 
 2
 The Hearst Metrotone News Film Library (Library) is a collection of approximately 27 million feet of news film produced by Hearst from 1918 to 1928, and includes related nonfilm items such as a system of index cards. It is undisputed that Hearst donated the Library to the University of California at Los Angeles (UCLA) in four separate transactions dated December 2, 1981, March 8, 1982, February 5, 1985, and November 19, 1985, and that the values of the gifts are deductible to Hearst under I.R.C. Sec. 170(a) (1988).[2] The dispute in this case involves the question of the proper valuation of the gifts.
 
 
 3
 In its tax returns for the 1981-1985 taxable years, Hearst claimed deductions for the gift of the Library in amounts which reflected a valuation of the Library of $62,000,080. The IRS disputed this valuation, and assigned the Library a value of $1,847,844. It then notified Hearst that there were deficiencies in Hearst's payment of income taxes for the 1981-1985 taxable years, and assessed additional taxes and interest against Hearst. Hearst timely paid these amounts, and filed refund claims with the IRS. After the IRS denied one of the claims, and did not respond to the others, Hearst filed suit in the CFC seeking a refund of the additional taxes paid.
 
 
 4
 At trial, Hearst offered the reports and testimony of two valuation experts, Messrs. James R. Bond[3] and Roger J. Grabowski. In his report, Bond analyzed ten sales transactions of film and newsreel collections that occurred between 1972 and 1989, and selected six as comparable to the donation to UCLA of the Library. Based on these six transactions, Bond concluded that the market values of the four transactions in question totalled $35,066,956.
 
 
 5
 Grabowski utilized a different technique, involving capitalization of income, to value the Library. Grabowski first estimated various income streams a donee could potentially derive from the Library, such as income from producing documentaries for the home video market. He then computed a present value of these income streams utilizing appropriate discount rates. He concluded that the market values of the four transactions totalled $22,926,242.
 
 
 6
 The Government offered the report and testimony of Herbert T. Spiro, another valuation expert. In his report, Spiro also used a capitalization of income approach to estimate the Library's value. Through his technique, Spiro estimated that the values of the four transactions totalled $1,860,335.
 
 
 7
 The Court of Federal Claims ultimately concluded that there were not four separate transactions, but only one. Quoting King Enterprises, Inc. v. United States, 418 F.2d 511, 516 (Ct.Cl.1969), and applying the 'end result' variant of the 'step transaction' doctrine--according to which disparate transactions are to be treated as one when "intended from the outset to be taken for the purpose of reaching the ultimate result," Hearst Corp. v. United States, Fed.Cl. at 214, the court concluded that the valuation dates of all four should be the date of the first, i.e., December 2, 1981. Id. at 214-15.
 
 
 8
 The court then undertook an analysis of the Bond, Grabowski, and Spiro valuations. It discounted the Bond valuation on the ground it "relies on noncomparable sales and overlooks the limitations of the market approach on the facts extant in this case." Id at 222. Likewise, it found the Grabowski valuation not credible, viewing it as "the product of highly speculative and optimistic assumptions that maximized each step in the calculations." Id. at 226. Finally, it determined that the Spiro valuation did not correctly take into account the costs of converting nitrate film to safety acetate film, and thus that it was "not a useful determination of the Library's fair market value on the valuation date." Id. at 229.
 
 
 9
 The court ultimately concluded that dismissal was appropriate because Hearst had failed in its burden of proving "the correct amount of the tax and resulting overpayment." Id. at 230 (citing Helvering v. Taylor, 293 U.S. 507, 515 (1935)). This appeal followed.
 
 DISCUSSION
 
 10
 On appeal, we undertake a complete and independent analysis of the criteria used by the court to value the Library. See Krapf v. United States, 977 F.2d 1454, 1458 (Fed.Cir.1992). Specific factual findings underlying that determination are reviewed under the clearly erroneous standard. Id.
 
 
 11
 Hearst states the issues as four. First, whether the court erred in holding, through application of the step transaction doctrine, that a single gift of the Library had occurred and that its fair market value was properly determined as of December 2, 1981, the date of the first of the four transactions. Second, whether the court erred in concluding that Hearst had not borne its burden of proof. Third, whether the court erred in failing to give due consideration to the rareness of the asset involved. Four, whether the court erred in failing to accept the conclusions of Hearst's experts regarding the fair market value of the Library.
 
 
 12
 The essential purpose of the step transaction doctrine is to assure that the tax consequences of a transaction turn on its substance rather than its form. King Enterprises, Inc. United States, 418 F.2d 511, 517 (Ct.Cl.1969). In a case in which substance and form do not diverge, the doctrine has no applicability. See Sheppard v. United States, 361 F.2d 972, 978 (Ct.Cl.1966).
 
 
 13
 Here, the two do not diverge. I.R.C. Sec. 170(a) delegates to the Secretary of the Treasury the authority to define the circumstances under which a charitable contribution shall be deductible:
 
 
 14
 There shall be allowed as a deduction any charitable contribution ... payment of which is made within the taxable year. A charitable contribution shall be allowed as a contribution only if verified under regulations prescribed by the Secretary. (Emphasis added).
 
 
 15
 Treas.Reg. Sec. 170A-1 (1993) constitutes the Secretary's pronouncement on the issue in relation to the valuation of a charitable gift of property. According to Treas.Reg. Sec. 170A-1(b), "[o]rdinarily, a contribution is made at the time delivery is effected." Treas.Reg. Sec. 170A-1(c)(1) states that in the case of a contribution of property other than money, "the amount of the contribution is the fair market value of the property at the time of the contribution...." Treas.Reg. Sec. 170A-1(c)(2) provides that "[t]he fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."
 
 
 16
 Together these sections fully support the fact that the four transactions in issue were substantively distinct, and have separate and distinct valuation dates, to wit, December 2, 1981, March 8, 1982, February 5, 1985, and November 9, 1985. As the trial court correctly noted, neither Hearst nor UCLA were obligated to make or accept any of the donations, either the first or any subsequent ones. The individual portions of the Library had commercial value to each party. Indeed, Hearst continued to license the footage it retained during the period 1981-85. Hearst v. United States, 28 Fed.Cl. at 211. The gifts were separate both in substance and in form. The Government concedes as much. Thus there was no basis for application of the step transaction doctrine.
 
 
 17
 The Government nevertheless argues that any error committed in this respect by the trial court was harmless. According to the Government, the trial court utilized the proper valuation date with regard to the December 2, 1981 transaction. In relation to the other transactions, the Government asserts that Hearst's appraisal evidence was rejected by the court "for several reasons having no bearing on the particular dates that the four portions of the Library were contributed." It further asserts in relation to these transactions that Hearst failed to offer "evidence appraising the portions of the newsreel library donated based on the specific content, size, and potential usefulness of each donated portion if owned separately from the whole."
 
 
 18
 We cannot agree that the error in treating these four transactions as one was harmless. A review of the court's opinion shows that its error in assuming the entire gift occurred in December 1981 infected its analysis throughout. For example, in considering the sale of the six films or film collections relied on in the Bond valuation--the Holt Collection, the Axelbank Collection, the Freud Film, the Kanter Collection, the Palmer Collection, and the British Pathe Collection--the court rejected all but three--the Holt and Axelbank Collections and the Freud Film--because the sales were not made in "pre-donation" transactions, i.e., each was sold after the critical date of December 2, 1981. Id. at 222. Moreover, in relation to the British Pathe Collection, the transaction given the most weight (45%) in the Bond valuation, the court observed that the relevance of that transaction was extremely questionable because of the length of time that had elapsed between the date of the transaction (1989) and the December 2, 1981 valuation date. As the court put it: "In 1989, the British Pathe collection differed from the Library property in 1981, and market conditions had changed extensively." Id. at 222.
 
 
 19
 Similarly, the trial court rejected the Grabowski valuation because of its reliance on information that, in the court's view, was not available or reasonably foreseeable as of December 2, 1981. As the court explained:
 
 
 20
 [M]arket factors that bear upon production of original programming, production of documentaries for the home video market, and the licensing of film for the stock footage/archival market, are limited to information available on December 2, 1981, and market developments foreseeable on that date. Accordingly, market factors discussed for the period 1970s through 1981 are those that are relevant to a determination of what a donor or a prospective purchaser could develop as a concept of ways the Library property could be exploited commercially.
 
 
 21
 * * *
 
 
 22
 * * *
 
 
 23
 The Grabowski report, completed in September 1991, presents analyses of data for the TV market during the 1980s, a period of extraordinary growth and changes. The cash flows in the report embody projections that reflect trends, some of which were nascent in the 1970s but which were not generally recognized at that time. Actual developments in the 1980-90 period exceeded expectations of the 1970s, and make the Grabowski report's projections appear to be reasonable. The only relevant consideration, however, is the state of the market and the expectations of Hearst's Board and of [UCLA] in December 1981. The report's emphasis on market data for the 1985-91 period is in error; only market information that was available in December 1981, has utility for cash flow projections in [sic] income approach for valuation of this 1981 charitable contribution.
 
 
 24
 Id. at 223, 226.
 
 
 25
 The trial court ultimately rejected all three appraisals for a variety of reasons, including the fact that they considered market events that occurred after 1981. The court then concluded that the IRS's allowed deduction was presumptively correct, and that plaintiff had failed to present acceptable evidence to rebut that presumption and to prove the correct amount of tax and resulting overpayment.
 
 
 26
 However, on this record and as explained above, we are unable to separate the trial court's rejection of plaintiff's evidence stemming from the court's erroneous valuation date decision from its rejection based on other problems with the valuations. The step transaction decision and what followed from it infected the trial court's view of the case in all aspects, including this phase of the case. We must vacate the judgment of the trial court and remand the matter for reconsideration based on treating the transactions as four separate and distinct charitable gifts.
 
 CONCLUSION
 
 27
 For all the foregoing reasons, the judgment of the CFC is vacated, and the case is remanded for further proceedings consistent with this opinion.
 
 COSTS
 
 28
 Each party to bear its own costs.
 
 
 
 [1]
 Effective October 29, 1992, the Claims Court was renamed the Court of Federal Claims. See Sec. 902 of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, 106 Stat. 4506, 4516 (1992)
 
 
 [2]
 The footage contributed in the four transactions was approximately 9.5 million, 4.3 million, 6.0 million, and 7.3 million, respectively
 
 
 [3]
 The record does not indicate whether Mr. Bond was otherwise connected with the film industry