DONALD E. CLARK AND PEGGY S. CLARK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9428-83.    Filed February 6, 1986.

*Walter B. Slocombe, Daniel B. Rosenbaum,* and *Daniel M. Davidson,* for the petitioners.

*Kathleen E. Whatley,* for the respondent.

TANNENWALD, *Judge*: Respondent determined a deficiency in petitioners' Federal income taxes for the taxable year 1979 of $972,504.74. The sole issue for decision is whether the receipt by petitioners of cash (boot) as partial consideration under a plan of reorganization pursuant to sec. 368(a)(1)(A) and (a)(2)(D),[1] should be treated as a dividend pursuant to sec. 356(a)(2), instead of long-term capital gain under sec. 356(a)(1).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. This reference incorporates the stipulation of facts and attached exhibits.

Petitioners, husband and wife, resided in Buckhannon, West Virginia, at the time they filed their petition in this case. They timely filed a joint Federal income tax return for the calendar year 1979 with the Internal Revenue Service Center in Memphis, Tennessee.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.

For some time prior to April 18, 1979, petitioner husband Donald E. Clark (hereinafter referred to as petitioner) owned all the outstanding stock (58 shares) of Basin Surveys, Inc. (BASIN), a West Virginia corporation. BASIN's principal business was furnishing radiation, nuclear, and electronic open-hole logging services to the petroleum industry. Petitioner was the president of BASIN from 1964 until April 18, 1979.

N.L. Industries, Inc. (NL), is a New Jersey corporation engaged in the manufacturing and supplying of petroleum equipment and services, chemicals, and metals. NL is a publicly held corporation whose stock is traded on the New York Stock Exchange and the Pacific Stock Exchange. As of the end of March 1979, NL had outstanding approximately 32,533,000 shares of its single class of common stock (par value $2.50 per share) and 500,000 shares of preferred stock. N.L. Acquisition Corp. (NLAC) was a wholly owned subsidiary of NL.

In 1978, NL initiated discussions with petitioner regarding the possible acquisition of BASIN by NL. After several months of negotiations, on March 6, 1979, NL offered petitioner a choice between two alternatives: in exchange for petitioner's BASIN stock, NL was willing to give petitioner either (1) 425,000 shares of NL common stock and no cash, or (2) a combination of 300,000 shares of common stock and $3,250,000 cash. Petitioner accepted NL's combined stock and cash offer. By accepting this offer, the total number of NL common shares outstanding increased to approximately 32,833,000 shares, and petitioner's stockholdings represented approximately 0.92 percent of that total. If petitioner had accepted the all-stock deal of 425,000 shares, the total number of NL common shares outstanding would have increased to approximately 32,958,000 shares, and petitioner's stockholdings would have represented approximately 1.3 percent of that total.

On April 3, 1979, an agreement and plan of merger (the plan) was executed by BASIN, NLAC, petitioner, and NL. The plan provided that on April 18, 1979, BASIN would merge with and into NLAC and that each outstanding share of NLAC would remain outstanding, each outstanding share of BASIN common stock would be exchanged for $56,034.482 cash and 5,172.4137 shares of NL common stock, and each

share of BASIN common stock held in the treasury of BASIN would be canceled. The plan further provided that the articles of incorporation of NLAC would be amended to change its name to Basin Surveys, Inc. Moreover, pursuant to the plan, petitioner signed a covenant not to compete for 5 years and an employment agreement to remain with Basin Survey, Inc., for 3 years.

For the purposes of this case, the parties agree that the merger of BASIN into NLAC (the merger) was effected pursuant to, and qualified as a reorganization under, section 368(a)(1)(A) and (a)(2)(D). The closing price of NL common stock on the New York Stock Exchange on April 18, 1979, was $23⅛ per share. Based on that closing price, the NL stock received by petitioner had a value of $6,937,500 which constituted 68.1 percent of the total value of the consideration which petitioner received for his BASIN stock. Prior to the merger, petitioners did not own any stock in NL or NLAC.

Petitioner's basis for his BASIN stock immediately prior to the merger was $84,515. He incurred expenses of $25,013 in connection with the merger. In their joint Federal income tax return for 1979, petitioners reported recognition of $3,195,294 of long-term capital gain as a result of the merger. As of April 18, 1979, BASIN had accumulated undistributed earnings and profits of $2,319,611, and total assets of $2,758,069 and liabilities of $808,132. Among its assets were $138,490 in cash, $1,231,552 in trade notes and accounts receivable (after allowance for bad debts), and buildings and other fixed depreciable assets with a book value net of accumulated depreciation of $929,306.

## OPINION

The issue for decision is whether the cash (boot) received by petitioner had the effect of a dividend under section 356(a)(2), and should therefore be taxed as ordinary income. Resolution of this issue requires us to choose between two judicially articulated tests (the so-called *Wright* test, *Wright v. United States*, 482 F.2d 600 (8th Cir. 1973), and the so-called *Shimberg* test, *Shimberg v. United States*, 577 F.2d 283 (5th Cir. (1978)), in interpreting what is, at best, an ambiguous statute. Respondent argues that we should

choose the *Shimberg* test and treat the $3,250,000 cash payment as if it constituted a distribution in redemption of stock by the *acquired* corporation (BASIN) prior to, and separate from, the merger. If this is our choice, then, according to respondent, since the redemption fails to satisfy the requirements of either section 302(b)(1) or (b)(2), the cash payment should be treated as a dividend from BASIN under section 356(a)(2) to the extent of its earnings and profits ($2,319,611), and as capital gain in respect of the excess.[2] Petitioner, on the other hand, urges us to choose the *Wright* test and treat the cash payment as a distribution by the *acquiring* corporation (NL) in a hypothetical redemption of the shares of NL stock that would have been received if petitioner had accepted stock in lieu of the cash consideration under the all-stock alternative available to him. Petitioner then argues that such a redemption would have resulted in a meaningful or substantially disproportionate reduction in petitioner's stock interest in NL and that consequently, the entire $3,250,000 cash payment should be treated as a payment in exchange for NL stock, under section 302(a),[3] taxable as capital gain under section 356(a)(1). For the reasons hereinafter set forth, in the context of this case, we agree with petitioners.

The issue of choice is not a novel one, although as will subsequently appear, the number of judicial precedents is limited. It has spawned a large number of articles and commentaries of both an historical and analytical nature[4] dealing with the proper test to be used in applying section

---

[2] Since the amount of the cash is not in excess of petitioner's gain from the exchange, the limitation of sec. 356(a)(1) does not come into play. We note that for the same reason, this limitation does not apply to the *Wright* test advocated by petitioner.

[3] The general rule of sec. 302(a) provides that "If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock."

[4] See Kyser, "The Long and Winding Road: Characterization of Boot Under Section 356(a)(2)," 39 Tax L. Rev. 297 (1984), and citations collected at p. 299, nn. 14 & 15; Rands, "Section 356(a)(2): A Study of Uncertainty in Corporate Taxation," 38 U. Miami L. Rev. 75 (1983); Levin, Adess & McGaffey, "Boot Distributions in Corporate Reorganizations - Determination of Dividend Equivalency," 30 Tax Law. 287 (1977); Golub, " 'Boot' in Reorganizations - The Dividend Equivalency Test of Section 356(a)(2)," 58 Taxes 904 (1980); Comment, "Determining Dividend Equivalence of 'Boot' Received in a Corporate Reorganization," 32 Tax Law. 834 (1979). See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.34, at 14-116 to 14-119 and S14-53 to S14-56 (4th ed. 1979 & Supp. 1985); D. Kahn, Basic Corporate Taxation, par. 10.51 (3d ed. 1981).

356 to acquisitive reorganizations.[5] While we deem it unnecessary to lay out a detailed, evolutionary history, a brief review of the statutory provisions and their historical genesis appears to be in order as a prerequisite to understanding the parameters of the choice we are called upon to make.

Sections 354 and 356 provide the tax treatment to be afforded shareholders of corporations which are parties to reorganizations qualifying as such under section 368(a)(l). Specifically, under section 354(a)(1)—

No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, *exchanged solely for the stock or securities in such corporation or in another corporation a party to the reorganization.* [Emphasis added.]

In situations in which the reorganization is not a straight stock-for-stock deal, but instead includes some additional consideration, the Internal Revenue Code (the Code) does not simply recategorize the entire transaction as a taxable exchange. Rather, it provides for a limited recognition of gain under section 356(a)(1)—

(1) RECOGNITION OF GAIN.—If—
　(A) section 354 or 355 would apply to an exchange but for the fact that
　(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

This gain is to be treated as a capital gain unless the exchange qualifies for dividend treatment under section 356(a)(2), which provides—

---

[5]Since sec. 368(a)(1)(E) (recapitalization) and (F) (mere change in identity, form, or place of organization) only involves a single corporation, a choice between the *Wright* test and the *Shimberg* test is not required. Similarly, in view of the "solely" requirement of sec. 368(a)(1)(B) (see *Heverly v. Commissioner*, 621 F.2d 1227 (3d Cir. 1980), revg. and remanding *Pierson v. United States*, 472 F. Supp. 957 (D. Del. 1979), and *Reeves v. Commissioner*, 71 T.C. 727 (1979); and *Chapman v. Commissioner*, 618 F.2d 856 (1st Cir. 1980), revg. and remanding *Reeves v. Commissioner, supra*), there never should be any "boot" and hence no occasion for choice where a "B" reorganization is involved. See also *McDonald v. Commissioner*, 52 T.C. 82 (1969), where a choice was made because respondent erroneously conceded the existence of a "B" reorganization (see Rev. Rul 75-360, 1975-2 C.B. 110).

If an exchange is described in paragraph (1) but *has the effect of the distribution of a dividend* * * * then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property. [Emphasis added.]

The precursor of section 356(a)(2) first appeared in the Revenue Act of 1924, which became, without significant change, section 112(c)(2) of the Internal Revenue Code of 1939. The following example, found in the report of the House Ways and Means Committee, is illuminating—

The necessity for this provision may best be shown by an example: Corporation A has capital stock of $100,000, and earnings and profits accumulated since March 1, 1913, of $50,000. If it distributes the $50,000 as a dividend to its stockholders, the amount distributed will be taxed at the full surtax rates.

On the other hand, Corporation A may organize Corporation B, to which it transfers all its assets, the consideration for the transfer being the issuance by B of all its stock and $50,000 in cash to the stockholders of Corporation A in exchange for their stock in Corporation A. Under the existing law, the $50,000 distributed with the stock of Corporation B would be taxed, not as a dividend, but as a capital gain, subject only to the 12½ per cent rate. The effect of such a distribution is obviously the same as if the corporation had declared out as a dividend its $50,000 earnings and profits. If dividends are to be subject to the full surtax rates, then such an amount so distributed should also be subject to the surtax rates and not to the 12½ per cent rate on capital gain. Here again this provision prevents evasions.

[H. Rept. 179, 68th Cong., 1st Sess. 15 (1924), 1939-1 C.B. (Part 2) 241, 252.]

Thus, it appears that the primary objective of Congress was to prevent shareholders from bailing out earnings and profits at capital gain rates when in essence the shareholders stood substantially in the same position before the reorganization as they did after the reorganization, i.e., "to prevent the bailout of earnings and profits at capital gains rates through the device of a reincorporation reorganization." See Kyser, *supra* note 4, at 302.

In *Commissioner v. Estate of Bedford*, 325 U.S. 283 (1945), the Supreme Court ruled that any distribution of "boot" pursuant to a reorganization would have the effect of a taxable dividend to the extent of the corporation's

accumulated earnings and profits, i.e., the so-called "automatic dividend rule." That decision met with much criticism, however (see, e.g., *Hawkinson v. Commissioner*, 235 F.2d 747, 750-751 (2d Cir. 1956)), and both the courts and the Internal Revenue Service have now retreated from the rule. See, e.g., *Shimberg v. United States*, 577 F.2d at 290; *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 418 F.2d 511, 520 (1969); *Johnson v. Commissioner*, 78 T.C. 564, 575-576 (1982); Rev. Rul. 74-515, 1974-2 C.B. 118, 120.

In its place, the courts have developed a concept which encompasses the determination of whether a distribution has "the effect * * * of a dividend" by looking to the provisions of section 302, although there is no express reference to that section in section 356(a)(2). Most of the courts have said that these two sections are to be read in pari materia. *Wright v. United States*, 482 F.2d at 605; *King Enterprises, Inc. v. United States*, 418 F.2d at 520; *Ross v. United States*, 146 Ct. Cl. 223, 173 F. Supp. 793, 797 (1959); *Hawkinson v. Commissioner*, *supra* at 751. The Fifth Circuit Court of Appeals, however, has adopted a somewhat more ambiguous approach by embracing and considering section 302 simply as providing " 'in appropriate cases' * * * 'useful guidelines for purposes of applying section 356(a)(2).' " *Shimberg v. United States*, *supra* at 287 n. 13. (Citation omitted.) Although Congress has not chosen specifically to amend the Code to reflect the interrelationship of these two sections, its acquiescence and tacit approval of such a conclusion is apparent in the Conference Committee Report for the Deficit Reduction Act of 1984, in which it was unequivocally stated that "The principles of section 302 are applicable in testing for dividend equivalency under section 356." H. Rept. 98-861 (Conf.) (1984), 1984-3 C.B. (Vol. 2) 1, 99. Furthermore, the Internal Revenue Service has adopted this position in its published rulings.[6] In point of fact, the distinction beween the "in pari materia" and the "useful guidelines" standard is little more than one of nuance and without any impact on the instant case since neither standard provides any significant help in making the choice before us.

---

[6] See Rev. Rul. 74-515, 1974-2 C.B. 118; Rev. Rul. 74-516, 1974-2 C.B. 121; Rev. Rul. 75-83, 1975-1 C.B. 112.

Turning to section 302(b), we find two situations, insofar as relevant to the case before us, in which a distribution in redemption of stock is to be treated as a distribution in part or full payment in exchange for such stock and not as a dividend. Section 302(b)(1) provides for such treatment, i.e., capital gain under section 302(a), "if the redemption is not essentially equivalent to a dividend." The Supreme Court has held that for a redemption to meet this test it "must result in a meaningful reduction of the shareholder's proportionate interest in the corporation." *United States v. Davis*, 397 U.S. 301, 312 (1970). Section 302(b)(2)(A) provides for such treatment if the "distribution is *substantially disproportionate* with respect to the shareholder." (Emphasis added.) A distribution qualifies as being "substantially disproportionate" if the shareholder's interest in the voting stock and the common stock (whether voting or nonvoting) of the corporation immediately after the redemption is less than 80 percent of his interest in such stock immediately before the redemption, and if immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote. Sec. 302(b)(2)(B) and (C). If the shareholder falls within this "safe harbor" constructed by Congress, the redemption is deemed to be "substantially disproportionate."

The first case[7] directly to confront the issue of whether, in determining the application of section 356(a)(2), the tests under section 302 should be applied in the context of a redemption by the *acquired* or the *acquiring* corporation was *Wright v. United States*, *supra*, in which the Eighth Circuit Court of Appeals held that the proper test for determining whether the distribution had "the effect * * * of a dividend" was to view the cash payment as a reduction of the taxpayer's stockholdings in the *acquiring*, i.e., surviving, corporation. In Rev. Rul. 75-83, 1975-1 C.B. 112,

---

[7] In *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 418 F.2d 511 (1969), there was no dispute that the dividend determination should be made with reference to the acquired corporation. See 418 F.2d at 521. In *Ross v. United States*, 146 Ct. Cl. 223, 173 F. Supp. 793 (1959), the Court of Claims thought the facts of that particular case so clear that it had no choice but to find that the distribution was made by the acquired corporation. *Hawkinson v. United States*, 235 F.2d 747 (2d Cir. 1956), seemingly determined dividend equivalency in terms of a distribution from the acquired corporation but clearly did not confront the issue of choice between the acquired and the acquiring corporation. See also pp. 151-152, and particularly *infra* note 15, discussing *McDonald v. Commissioner*, 52 T.C. 82 (1969).

however, the respondent expressly rejected the holding in *Wright* and said it would not be followed. Instead, respondent focused on the cash payment as a reduction of the taxpayer's stockholdings in the acquired corporation, prior to the reorganization. The Fifth Circuit Court of Appeals adopted a similar stance in *Shimberg v. United States, supra,* in which it also rejected the holding and reasoning of *Wright* as erroneously placing the emphasis on the surviving, instead of the acquired, corporation. See 577 F.2d at 287.

*Wright v. United States, supra,* involved the consolidation of two closely held corporations into a new corporate entity (Omni). The old corporations were commonly owned, but in different proportions. A simple merger involving the exchange of shares of these corporations for shares of Omni would not have resulted in the ownership percentages in Omni desired by the controlling shareholders. As a result, pursuant to the reorganization, "boot," in the form of a promissory note, was paid to the majority stockholder to compensate him for taking a reduced equity interest in Omni.

In determining dividend equivalency, the Eighth Circuit first focused on who in fact issued the note constituting the "boot," i.e., the old corporations or Omni. While recognizing that "it is not material whether the distribution is actually made by the corporation entering the reorganization or by the corporation resulting from the reorganization," the court emphasized that it could not ignore "the factual circumstance that there were two corporations * * * before reorganization and one after reorganization." 482 F.2d at 607. The court found that, within the context of the entire plan of reorganization, it was artificial for respondent to contend that the note was issued by the old corporations. Instead the court held that "the note was issued by Omni in exchange for a portion of Omni stock that the taxpayer would have received if he had taken Omni stock entirely instead of receiving Omni stock and a note issued to him by Omni." 482 F.2d at 607. The court concluded that the rationale underlying the redemption provisions mandated such a result—

The entire concept of a redemption contemplates a change in ownership between an ongoing corporation and a newly formed corporation or within an ongoing corporation itself. For example, underlying the "safe harbor" provision, sec. 302(b)(2), is the rationale that a substantially disproportionate redemption of stock leads to the conclusion that the exchange is a redemption. The percentage requirements, e.g. the 50 per cent rule, refers to the necessity of having 50 per cent of the total voting stock *after redemption*. This rule and other redemption provisions make sense only in relation to a corporation that will continue to exist. If a substantially disproportionate redemption of stock has occurred the distribution clearly can be said to be a sale rather than a dividend because the stockholder has relinquished valuable rights in the future business. Further, the rights of stock ownership—to vote, to participate in earnings, and to share in net assets on liquidation—are all affected by a redemption. But these rights and the effect of a redemption only make sense in relation to a corporation that will be engaged in doing business after the redemption. To analyze the present case as a redemption of [the old corporations'] stock alone * * * is an artificial reading of the redemption provisions, for [the old corporations] were dissolved as part of the Plan. The change in ownership that would be significant due to a redemption would be a change in ownership in Omni, the corporation that would exist after the redemption and would have voting stock, earnings, and assets that would be affected. [482 F.2d at 607-608. Emphasis supplied.]

In *Shimberg v. United States, supra*, the Fifth Circuit Court of Appeals was faced with a factual set of circumstances similar to the instant case. The taxpayer in that case owned approximately 67 percent of a LaMonte-Shimberg Corp. (LSC), of which he was president and chief executive officer. Pursuant to a plan of reorganization, LSC was merged into a large publicly held corporation called MGIC Investment Corp. (MGIC) whose stock was traded on the New York Stock Exchange. According to the terms of the merger, the stockholders of LSC received ratably, in exchange for all their LSC stock, stock of MGIC and cash "boot" of $625,000. The taxpayer received $417,449 in cash and stock in MGIC constituting less than 1 percent of MGIC's total shares outstanding. Immediately prior to the merger, LSC had undistributed earnings and profits in excess of $625,000.

As in *Wright*, the issue before the Fifth Circuit was whether the taxpayer's receipt of cash "boot" had the effect of a dividend distribution. The District Court had found for the taxpayer, basing its decision on an apparent misinter-

pretation of the holding in *Wright. Shimberg v. United States*, 415 F. Supp. 832 (M.D. Fla. 1976). After a preliminary discussion of the Eighth Circuit's application of the *Davis* "meaningful reduction" test in *Wright*, the District Court concluded that the taxpayer's relinquishment of ownership and control of a small, local company in exchange for a "miniscule percentage of the outstanding stock of a huge, publicly-held corporation [made it] * * * clear that the merger resulted in a radical change and meaningful reduction in the nature of the [taxpayer's] interest in the continuing business." 415 F. Supp. at 836. Thus, rather than focusing solely on the taxpayer's interest in the surviving corporation, the District Court misconstrued *Wright* to mean that the proper test for determining dividend equivalency was a comparison between the taxpayer's interest in the acquiring, i.e., surviving, corporation after the reorganization and the interest he held prior to the reorganization in the acquired corporation.

The Fifth Circuit Court of Appeals reversed, finding that the District Court's application of the "meaningful reduction" test of section 302(b)(1) was incorrect and that the "undifferentiating invocation of stock redemption principles in a reorganization case such as this is erroneous." 577 F.2d at 287. It is apparent that the Court of Appeals predicated its rejection of the lower court's holding on its mistaken view that the District Court had properly interpreted and applied the *Wright* test. This is clearly borne out by the court's finding that—

A contrary holding would render section 356(a)(2) virtually meaningless when a large corporation swallows a small one in a reorganization, for there will always be a marked decrease in control by the small corporation's shareholders, unless the same shareholders control both corporations. And, even in that situation, disproportionate ownership—as in *Wright*— could result in a meaningful reduction. [577 F.2d at 288.[8]]

---

[8]The Fifth Circuit's misunderstanding of the *Wright* holding is even more clearly evidenced in *General Housewares Corp. v. United States*, 615 F.2d 1056 (5th Cir. 1980). In that case, pursuant to a plan of reorganization qualifying as such under sec. 368(a)(1)(C), the two shareholders of Olivier Co., Inc. (Olivier), who held two-thirds and one-third of its stock, respectively, received pro rata cash payments and stock of U.S. Industries (USI), constituting 0.4 percent and 0.2 percent, respectively, of the total outstanding stock of USI. The Fifth Circuit, in discussing the decision in *Wright*, stated—

"Here, if the *Wright* test were applicable, we would be concerned with a reduction from a 66⅔% and 33⅓% interest in Oliver stock for [the two shareholders] respectively to a 0.4% and

Having rejected the District Court's analysis, the Fifth Circuit reasoned that, according to the theory and legislative history behind the reorganization provisions "section 356(a)(2) requires a determination of whether the distribution would have been taxed as a dividend if made prior to the reorganization or if no reorganization had occurred." 577 F.2d at 288. It then concluded that, since absent the reorganization, a pro rata distribution of $625,000 to LSC shareholders would have been a dividend taxable as ordinary income, "The taxpayer should not be able to reap the benefits of capital gain treatment simply because he received his share of the distribution after the merger in the form of a 'boot' rather than before the merger in the form of a dividend." 577 F.2d at 289.

After careful consideration, we have concluded that, at least in the context of the factual situation before us, the *Wright* test is the better choice in respect of the application of section 302 to the determination of whether "boot" has "the effect of the distribution of a dividend" under section 356(a)(2). Several considerations have led us to this conclusion.

The genesis of section 356(a)(2) (see p. 143 *supra*), lay in Congress' concern for the possibilities of manipulated withdrawals within the framework of reorganizations which approached the types of transactions which have been dealt with in later years through the application of the liquidation-reincorporation doctrine. See B. Bittker & J. Eustice, *supra* note 4, par. 14.54.[9]

While we recognize this clear intent by Congress to prevent abusive cash bailouts made pursuant to planned reorganizations, as well as the fact that the language used in section 356(a)(2) may have been broader than necessary to deal with the legislative concern, contrary to respondent's position we do not think it follows that we must test "boot" distributions in connection with a reorga-

---

0.2% respective interest in the outstanding USI stock. [615 F.2d at 1066.]"

Once again, the Fifth Circuit misinterpreted the *Wright* test as comparing shareholder interests in the old corporation to those in the surviving corporation.

[9]Subsequent legislative history is of little help in resolving the choice issue. Proposals in 1954 and 1959 seem to have embraced respondent's position herein while more recent proposals embrace the position espoused by petitioner; none of these proposals have been adopted. See Kyser, *supra* note 4, at 322-323; Rands, *supra* note 4, at 93-94; Golub, *supra* note 4, at 905-906; B. Bittker & J. Eustice, *supra* note 4, at S14-51 to S14-56.

nization, as if they were made by the acquired corporation prior to and separate from the reorganization. As we have noted in the past, in legitimate reorganizations that substantially reduce a shareholder's ownership interest, although it may be true "that a decision in favor of the petitioner would allow him to withdraw substantial corporate earnings at no tax (or, if his basis in the redeemed stock were less than the amount distributed, at capital gains rates) * * * such result does not require us to hold that the distribution is a dividend." *McDonald v. Commissioner*, 52 T.C. 82, 89 (1969).

Respondent asks us to follow a twisted path. After conceding that the distribution has been made pursuant to a legitimate reorganization under section 368(a)(1)(A), a necessary prerequisite to invoking section 356(a)(2), respondent then asks us to make our determination of dividend equivalency fantasizing that the reorganization does not exist.[10] Clearly, if Congress had wanted the distribution to be viewed in this manner, it could easily have said so in 1924 or in connection with the passage of numerous revenue acts in the ensuing 60 years.[11]

We reject respondent's attempt to bootstrap the holdings that the acquired corporation's earnings and profits should be the measure of any dividend under section 356(a)(2) into a conclusion that the determination of the requisite reduction in interest under section 302(b) must be necessarily made with reference to the same corporation. In our opinion, there is no such necessary correlation. There is no reason why the redemption cannot be considered as having been made by one corporation with the consequences to be measured by the earnings and profits of another corporation. Compare section 304(b)(1) with section 304(b)(2)(A). Moreover, the courts are not in agreement as to the standard of measurement to be used. See *Atlas Tool Co. v. Commissioner*, 70 T.C. 86, 106-107 (1978), affd. 614 F.2d 860, 868 (3d Cir. 1980).[12] Indeed, respondent on brief has

---

[10]See *supra* note 9 for the conflicting attempts by Congress to deal with the choice issue.

[11]Furthermore, the limitation of dividend treatment contained in sec. 356(a)(2) is a clear indication that Congress considered the boot distribution to be an integral element of the reorganization. See Levin, Adess & McGaffey, *supra* note 4, at 303.

[12]See also *Davant v. Commissioner*, 366 F.2d 874, 887-890 (5th Cir. 1966), revg. on this issue *South Texas Rice Warehouse Co. v. Commissioner*, 43 T.C. 540, 570-572 (1965); *American Manufacturing Co. v. Commissioner*, 55 T.C. 204, 230-231 (1970).

made it clear that his acceptance of the agreed stipulation of the parties that the earnings and profits of BASIN will be the measure of any dividend determined herein is not to be construed as an acceptance of this test in any other case.

Respondent's attempt to view the cash payment as an isolated event totally separate from the reorganization runs counter to the established case-law principle known as the "step-transaction" doctrine—a doctrine which respondent has zealously and generally successfully sought to apply in the reorganization arena. See Levin, Adess & McGaffey, *supra* note 4, at 290; Rands, *supra* note 4, at 117. In *McDonald v. Commissioner, supra*, we held that the "step-transaction" doctrine, first set forth in *Zenz v. Quinlivan*, 213 F.2d 914 (6th Cir. 1954),[13] was "applicable in determining whether a redemption is essentially equivalent to a dividend within the meaning of section 302(b)(1)." 52 T.C. at 87. The facts in *McDonald*, simply stated, are as follows. Taxpayer owned 10 of the 11 shares of the common stock of E & M Enterprises, Inc. (E&M), and all of its preferred stock. Pursuant to a plan of reorganization, E&M redeemed all of taxpayer's preferred stock for $43,500, and Borden Co. (Borden), the corporation acquiring E&M, gave 4,839 of its shares in exchange for the 11 shares of E&M common stock. E&M acquired the cash to carry out the redemption by obtaining a short-term bank loan. A week after the redemption, E&M and Borden exchanged their shares and Borden transferred cash to E&M which was used in part to pay off the loan. Respondent argued that the redemption by E&M of taxpayer's preferred stock was a totally separate transaction and thus taxable as a dividend.[14] In holding for

[13]The taxpayer in *Zenz* wished to sell all the stock in a corporation in which she was the sole stockholder. To satisfy the wishes of the purchaser who did not want to buy all the stock of the corporation, the parties agreed upon a plan under which the purchaser bought part of the stock and the corporation redeemed the remaining shares. The court viewed the steps in the transaction as part a single integrated plan intended to totally liquidate the taxpayer's holdings in the corporation. In light of this, the court held that redemption was not essentially equivalent to a dividend because it completely terminated her interest in the corporation. See 213 F.2d at 917.

[14]It should be noted that, at trial, respondent considered the redemption and exchange to be separate transactions and therefore conceded that the exchange constituted a tax-free reorganization under sec. 368(a)(1)(B). 52 T.C. at 86. However, in Rev. Rul. 75-360, 1975-2 C.B. 110, the respondent recognized that—

"it was in error in arguing the various steps were separate transactions thereby affording tax-free treatment on the stock exchange. Accordingly, since the acquisition was not solely for voting stock of the acquiring corporation, but partly for cash, that the acquisition of stock of

the taxpayer, we recognized that "The record in this case establishes clearly that the *redemption was merely a step in the plan of Borden for the acquisition of E&M, so that it is the results of the plan that are significant to us.*" 52 T.C. at 87 (emphasis added). We concluded that "Taking into account all the circumstances of this case * * * the redemption and the reorganization effected such a substantial change in the petitioner's interest in E&M as to establish that the redemption was not essentially equivalent to a dividend." 52 T.C. at 89.

We recognize that some argument can be made that the same failure to apply the step-transaction doctrine exists in applying the *Wright* test in that such test involves viewing the cash payment as being in redemption of an imputed number of shares of the acquiring corporation after the reorganization has occurred. See Rands, *supra* note 4, at 102-103. But we think this argument fails in that the *Wright* test treats the cash payment as the equivalent of a redemption *in the course of implementing the reorganization*, while the *Shimberg* test, advocated by respondent, requires that the redemption by the acquired corporation be treated as having occurred *prior to and separate from the reorganization*. Clearly, the cash payment in situations of the type involved herein would not have taken place *without the reorganization*. The same cannot be said of the redemption created by the *Shimberg* test.

In view of the foregoing, we conclude that the determination of whether the cash payment to petitioner had "the effect * * * of a dividend" should be viewed and tested within the context of the entire reorganization. To hold otherwise, and view and test the cash (boot) as if it were distributed as a hypothetical redemption by BASIN prior to the reorganization, would in effect resurrect the now discredited "automatic dividend rule" (see pp. 143-144 *supra*), at least with respect to pro rata distributions made to an acquired corporation's shareholders pursuant to a plan of reorganization.

We turn now to the question whether petitioner, as a result of the reorganization, suffered a reduction in interest

E&M did not constitute a reorganization. Therefore * * * the entire transaction is considered a taxable sale or exchange."

sufficient to qualify the cash he received as a redemption under section 302(b). In resolving this question, we apply the test enunciated in *Wright v. United States, supra,* and look at the effect of the reorganization on petitioner's potential and actual interest in NL, the acquiring, i.e., surviving, corporation.[15]

Pursuant to the plan, petitioner received 300,000 shares of NL common stock, which constituted approximately 0.92 percent of the total shares outstanding of NL common stock after the merger. If petitioner had accepted the all stock offer, he would have received 425,000 shares of stock, which would have constituted approximately 1.3 percent of NL's total shares outstanding. By treating the cash "boot" as a redemption of petitioner's shares, we find that the cash distribution reduced petitioner's interest in NL by approximately 29 percent (from 1.3 percent to 0.92 percent) so that his post-distribution holdings were only approximately 71 percent of what they would have been absent the distribution. Coupled with the fact that petitioners held less than 50 percent of the voting stock of NL after the redemption, under section 302(b)(2) the distribution qualifies as being "substantially disproportionate" and is not taxable as a dividend. Since the distribution falls within the mechanistic "safe harbor" of section 302(b)(2), we need not decide if the redemption resulted in a meaningful reduction of petitioner's stock interest under section 302(b)(1).

In point of fact, respondent does not argue that the required reduction in petitioner's interest does not exist if the *Wright* test is applied. Rather, the heart of respondent's position is that use of the *Wright* test results in an "automatic capital gain" rule. Respondent argues that, in cases involving factual circumstances similar to the instant case, in which the "whale" swallows the "minnow" and gives the shareholders of the acquired corporation a pro

---

[15]We recognize that it is possible to construe our opinion in *McDonald v. Commissioner,* 52 T.C. 82 (1969), as adopting a test based upon a comparison of a taxpayer's stock interest in the acquiring corporation with his prior interest in the acquired corporation. However, we think it significant that *McDonald* was decided prior to either *Wright* or *Shimberg,* that the issue before this Court was simply whether the redemption was separate from, or an integral part of, the reorganization, and that it appears that the acquired versus acquiring corporation test for applying sec. 356(a)(2) was not presented to us. Such being the case, and particularly since the result in *McDonald* would have been the same under the *Wright* test, we do not view our opinion in *McDonald* as inhibiting our freedom to choose the test which should be applied herein.

rata distribution of boot in addition to stock, those shareholders will always be afforded capital gain treatment. He reasons that if a shareholder in a small closely held corporation exchanges his interest in that corporation for what must be, almost by definition, a much smaller percent of ownership in a large publicly held corporation, a comparison of these percentage ownership figures will always be so disparate as to qualify as a meaningful reduction or as substantially disproportionate in the context of a redemption by the acquiring corporation. In effect, respondent's position is rooted, as was that of the District Court in *Shimberg v. United States*, 415 F. Supp. 832 (M.D. Fla. 1976), in an erroneous equating of the *Wright* test with a comparison of a taxpayer's interest in the acquired corporation before the reorganization with his interest in the acquiring corporation after the reorganization. See pp. 147-150 *supra*. We think we have made it clear that the *Wright* test does no such thing. It simply compares the stock interest which a taxpayer actually receives in the acquiring, i.e., surviving, corporation in a reorganization with what he would have received if he had obtained additional stock in lieu of the cash payment. Whether the results of such a comparison indicate dividend or capital gain treatment will vary, depending on the facts and circumstances of each individual case. We think it significant that respondent in substance accepts the facts and circumstances limitation in situations involving section 356(a)(2).[16] In so doing, he reflects the same uncertainties as those of the Fifth Circuit in *Shimberg v. United States, supra*—uncertainties which, in a sense, are also present in

---

[16]We quote from respondent's brief (p. 27):

"We are only addressing in this brief a factual situation which is identical to the one present in *Shimberg* where a small corporation (the "minnow") was merged into a large corporation (the "whale"), there had been no previous commonality of ownership between the two corporations, the "minnow's" shareholders received cash and stock on a pro rata basis, the "minnow's" shareholders stock ownership in the "whale" was very small vis-a-vis the number of shares outstanding, and the acquired corporation had a significant amount of accumulated undistributed earnings and profits."

In connection with the facts and circumstances limitation, we observe that respondent objected at trial to the relevancy of any testimony regarding the merger negotiations. We overruled respondent's objection and reserved to respondent the right to argue the question of admissibility on brief. We are satisfied that we should adhere to our ruling at trial. See *McDonald v. Commissioner*, 52 T.C. 82, 88 (1969).

our reservation of the same limitation in adopting the *Wright* test.[17]

While we are satisfied that the *Wright* test should not be equated with the comparison erroneously made by the District Court in *Shimberg v. United States, supra,* we think that the minnow-whale scenario is a background element which can be taken into account. Cf. *McDonald v. Commissioner, supra.* See also *supra* note 15.

If we look at the particular facts and circumstances of the instant case, the correctness of our conclusion that the cash distribution of $3,250,000 did not have "the effect * * * of a dividend" under section 356(a)(2) becomes even clearer. There is not the slightest evidence that the cash payment was a concealed distribution from BASIN.[18] Indeed, it is hard to conceive that such a possibility could even have been considered, for a distribution of that amount was not only far in excess of the accummulated earnings and profits ($2,319,611), but also of the total assets of BASIN ($2,758,069). In fact, only if one takes into account unrealized appreciation in the value of BASIN's assets, including good will and/or going-concern value, can one possibly arrive at $3,250,000. Such a distribution could only be considered as the equivalent of a complete liquidation of BASIN, which would call for capital gain treatment under *Zenz v. Quinlivan, supra.* Moreover, the record herein makes it clear that it was NL which developed the stock plus cash alternative and that its foundation was attributable to a desire of NL to minimize the number of shares outstanding. In this connection, we think that the question of whether the shareholders of the acquiring corporation are given a choice between all stock and stock plus cash in the acquired corporation is not the significant factor. See *McDonald v.*

[17]It is interesting to note that the Court of Appeals in *Wright v. United States,* 482 F.2d 600 (8th Cir. 1973), would have reached a different conclusion if the attribution rules of sec. 318(a) had been applied. See 482 F.2d at 610. See also Kyser, *supra* note 4, at 312 n. 78. Under sec. 227(b) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, 492, the attribution rules of sec. 318 now apply to "boot" payments falling within sec. 356(a).

[18]It is in this context that the facts and circumstances analysis might well produce a different result when there is persuasive evidence of an identity between the amount of the cash payment, the earnings and profits of the acquired corporation, and available liquid assets to support the conclusion that the acquiring corporation was a conduit for the payment. Cf. *Ross v. United States, supra* note 7. The problem of identification of the source of a cash payment is not without its difficulties. See Levin, Adess & McGaffey, *supra,* note 4, at 290 n. 15.

*Commissioner, supra* at 89. As a general rule, we would apply the *Wright* test where only the latter offer was available. However, the source of the offer in whatever form may be a fact and circumstance to be taken into account in certain situations. See *supra* note 18.

Our analysis of the issue before us herein has convinced us that neither the *Shimberg* test nor the *Wright* test can be inexorably applied to "boot" distributions in connection with a reorganization, fully within which the ambit of section 356(a)(2). Each test has its supporting and criticizing arguments. See, e.g., Kyser, *supra* note 4; Rands, *supra* note 4; Levin, Adess & McGaffey, *supra* note 4; Comment, *supra* note 4. However, we think that, on balance, the *Wright* test is the more suitable vehicle for decision principally because its application produces a result more within the scope of the type of reorganization Congress had in mind in enacting section 356(a)(2), i.e., where there is an overlapping of ownership between the acquired and acquiring corporations, than the *Shimberg* test which would tend to produce exactly the opposite result. Moreover, unlike the *Wright* test, the *Shimberg* test would make the result dependent upon which corporation, the acquired or the acquiring, survived a merger. Indeed the deficiencies in the *Shimberg* test are sufficient to cause its supporters to suggest that the *Wright* test be applied where there is a "commonality" of ownership of the acquired and acquiring corporations and the *Shimberg* test be reserved for situations where such commonality does not exist. See, e.g., Kyser, *supra* note 4, at 331; Rands, *supra* note 4, at 116. We have difficulty in applying such a bifurcated approach to a statute which seems to make no distinction between different reorganizations. Cf. *American Manufacturing Co. v. Commissioner*, 55 T.C. 204, 230-231 (1970); Levin, Adess & McGaffey, *supra* note 4, at 306. Furthermore, such an approach would add another difficult dimension to the application of section 356, i.e., determining how much overlap of stock ownership would constitute commonality. See Kyser, *supra* note 4, at 329-332.

One final word. The root of the problem of choice between the *Wright* test and the *Shimberg* test lies in the low level of "continuity of interest" required to constitute a type of

tax-free reorganization. The result of this low-level requirement is to cause transactions to be treated as reorganizations which really should be considered sales, i.e., where there is a substantial amount of cash paid and/or the stock of the acquiring corporation can be readily disposed of by the taxpayer. See, e.g., Kyser, *supra* note 4, at 315 n. 90 and 340. But this condition has existed far too long for the judiciary now to change the rules of the game. If a change is to come, it must come from the legislature. We think the same is true with respect to adopting a bright-line test, under section 356(a)(2), i.e., a rule applicable without qualification to all cases, to determine whether a distribution has "the effect * * * of a dividend." In the meantime, the courts, the Executive, and taxpayers will be forced to live with a test which admittedly is imprecise in that it will not be inexorably applicable in all situations.

To reflect the foregoing and petitioners' concessions on other issues,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, GOFFE, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, WRIGHT, and WILLIAMS, *JJ.*, agree with this opinion.

SIMPSON, WILBUR, CHABOT, GERBER, and PARR, *JJ.*, did not participate in the consideration of this case.